JONES *v.* TINDALL.

4-9045                                                226 S. W. 2d 44

Opinion delivered January 16, 1950.

Rehearing denied February 13, 1950.

*E. J. Butler* and *Hale & Fogleman,* for appellant.

*J. L. Shaver,* for appellee.

LEFLAR, J.    This case, consolidated with another, was before this court in *Tindall* v. *Jones,* 212 Ark. 860, 208 S. W. 2d 173.    In the 1947 trial from which that appeal arose the Chancellor decreed that a certain loan made by C. A. Tindall to Will and Isabella Jones was usurious, and that notes and a deed of trust incident to the loan should

be forfeited and cancelled. Because much of the evidence was vague and uncertain, the case was reversed and remanded for further development, though the companion case, with essentially similar evidence more fully developed, was affirmed. At the new trial, the Chancellor held the loan not usurious and allowed recovery by the plaintiff lender. Defendants appeal.

Will and Isabella Jones, elderly Negroes, had bought a 40-acre farm in Cross county from Howard Curlin of Crittenden county, their former residence, on an installment payment basis. Mr. Curlin died in 1941, and Mrs. Curlin, his administratrix, was trying to settle up his estate. The Jones debt had been reduced, but Jones was behind in his payments. Mrs. Curlin was not pressing for immediate payment, but Jones knew the situation and was anxious to satisfy the debt.

One H. K. Gish of Memphis, Tennessee, was traveling about east Arkansas in his car seeking to make secured loans to Negroes. Gish came to Will Jones' farm and solicited a contract to lend Jones money. Thereafter he had Will and Isabella Jones come to his office in Memphis where on October 20, 1943, the Joneses signed a series of twelve promissory notes, due over a six-year period, and a deed of trust conveying their 40-acre farm as security for the notes. Six of the notes purported to be for principal, and six for interest. The six notes for principal totaled $4,250; the six notes for interest, figured at six per cent, totaled $1,177.08. The notes were made out in favor of plaintiff, C. A. Tindall; Gish's name does not appear upon them. The Joneses testify that they did not know, and were not told, what the totals were, either of principal or interest, at the time the instruments were executed. They testify that they were borrowing the money for the sole purpose of paying off the Curlin debt, the amount of which Gish had checked with Mrs. Curlin, and they assumed that the principal notes totaled that amount, with the interest notes extra. Will Jones' testimony was:

". . . I just signed my name. . . . Q. Did you read the papers? A. I was so glad I just signed

my name. . . . Q. How much money did he tell you he was letting you have? A. He didn't make no personal amount. Q. Did he give you any money? A. Nothing at all, just wrote me up and signed me up. Q. What did they do with the money? A. Paid Mrs. Curlin.''

The amount which Jones owed Mrs. Curlin, and the amount paid to her from the proceeds of this Memphis loan, was $2,990.51. This figure is uncontradicted and cannot be contradicted. It is fixed by Mrs. Curlin's testimony, by her attorney, and by their records, and is admitted by plaintiffs. The Joneses claim that this is all they received for their notes for $4,250 principal and $1,177.08 interest.

It appears that Will Jones paid the first pair of notes, for $400 principal and $262.08 interest, to Tindall when they were due, then went to Tindall's office to pay the second pair of notes a year later but before paying inquired as to how much he still owed. When he was told that he still owed $3,850 principal and over $900 interest he denied that he owed any such amount and refused to make the second payment. Tindall then brought the present suit for foreclosure of the deed of trust.

At the first trial Tindall contended that he was a *bona fide* purchaser of the notes and deed of trust from Gish, and that Gish was not his agent but an independent lender. A mass of evidence establishes the contrary. It suffices now, however, to recall that this court in its earlier opinion on these facts, 212 Ark. 860, 208 S. W. 2d 173, held that Gish acted as Tindall's agent in making the loan. In keeping with this determination, an amendment to plaintiff's complaint filed after the case was remanded refers to the $2,990.51 paid to Mrs. Curlin as being ''part of the $3,800 which the said C. A. Tindall loaned to Will Jones and Isabella Jones.''

At this stage Tindall assumed that the Jones loan was his own from the beginning, but contended that the principal sum of the loan actually was $3,800. This was supported, at least in a sense, by the fact that Tindall

actually gave Gish, through an intermediary, a check for $3,800 when the loan was closed. Tindall through his own testimony explained that the $450 difference between the $4,250 principal sum of the notes and the $3,800 outlay was a "discount," the profit above six per cent interest which he hoped to make on the transaction. This difference was not used to pay Gish for his work or to pay any other expenses connected with the loan.

To support plaintiff's claim under this theory of the facts, a detailed calculation of interest at ten per cent on $3,800 was included in the briefs, showing that for the six-year period of the loan, with credit for payments to be made as due, ten per cent interest would make a total $59.89 larger than the $5,427.08 sum of the original notes ($4,250 plus $1,177.08). In other words, if the loan was actually for $3,800, the total repayment promised by Jones would not be usurious. By the same calculation, if the loan to Jones was a little less than $3,800, even $100 less, the transaction would be usurious.

When the case was first submitted to this court (212 Ark. 860, 208 S. W. 2d 173) the record and the testimony were badly confused. This was particularly true of the testimony of Will and Isabella Jones. They spoke of the Curlin debt as being roughly $3,000, and then referred to another $400, or $700 or $800, or more, that they had received from Gish at another time. There was testimony indicating that another and separate loan had been made by Gish to Jones, and it was not clear whether Will and Isabella Jones were talking about both loans together, or only the one currently sued on. If they were testifying about the one only, their own testimony indicated that there might not be usury. McHANEY, J., speaking for the court said: "The Jones case follows the same pattern as the Sims case.[1] Notes and a deed of trust

[1] In the Sims case (also 212 Ark. 860, 208 S. W. 2d 173) it was shown that Sims received $1,900 but signed notes to Tindall for $2,600 plus six per cent interest, the excess being divided between Tindall and Gish. The loan was declared void on account of the usury. It was further shown that this pattern was customary in Tindall's business, the record showing that ten such loans to Negro landowners, all with notes executed in amounts larger than actual borrowings, had been negotiated by Gish for Tindall in East Arkansas in the fall of 1943.

were executed to appellant for a larger amount than the borrower asked for or received. But the testimony of Will Jones and his wife as to the actual amount received by them under the loan is too indefinite and uncertain to justify a finding of usury. . . . Whether appellees meant they received the sum stated above out of the loan made by appellant, or whether they received said amount from both loans, we are unable to say.''

At the new trial, the testimony of both Will and Isabella Jones was definite. They testified that the only money paid in their behalf from the first loan was the $2,990.51 received by Mrs. Curlin. They also testified definitely that there was a second loan, this one from Gish and not Tindall, on which they received $400 but executed notes for $700. The existence of this second loan was clearly proved; the second mortgage securing it was on record in the Cross county recorder's office. It was dated January 1, 1944, a few months after the date of the first loan. The total testimony of the Joneses, at both trials, is now susceptible to one interpretation only —they say that they received only $2,990.51 from the plaintiff's loan. The ambiguity that previously existed in their testimony is now resolved. Evidence that plaintiff's loan was actually for $3,800 must be found elsewhere if at all.

At the second trial plaintiff presented the testimony of one I. H. Rena, a neighbor of Will Jones, that Jones owed him something like $370 or $380 and that he had in the fall of 1943 received from someone in Memphis a check paying off the Jones debt in full. Rena did not remember who sent him the check, or who signed it, or why it was sent to him from Memphis. Jones testified that he had never owed Rena that much, and that he had always paid Rena what he owed him from time to time from other sources. Assuming, however, that Rena was paid off by Tindall or Gish from the proceeds of the first loan, that would make a total, at the most, of $3,370.51 paid to Jones' use, and that is the sum total of the evidence.

. It is proved that Tindall wrote a check for $3,800 when he accepted the Jones notes for $4,250 and interest.

The check was payable to his agent. If the check or its proceeds were disbursed for the benefit of Jones, it seems that Tindall or his agents could produce the evidence to prove it. They offered no such evidence. Gish was not even called as a witness.

Tindall's testimony is definite that he gave his agent Gish nothing except the $3,800. If Gish paid out the whole $3,800 to Jones' use, then Gish's labors were free; he received no pay for working up the loan. He was under no pressure or compulsion to work for nothing; Tindall testified, as to how Gish might be getting paid: "I knew nothing of the details of it." If Gish kept none of the $3,800 for himself and for expenses incurred in working up the loan, it was because he chose voluntarily to serve without reward. It is permissible to infer that this was not the case. Without doubt Gish retained for himself a substantial part of the $3,800. We conclude that Will Jones did not receive $3,800 from the loan made on October 20, 1943.

Though the instruments here involved were executed and payable in Tennessee, they included the following provision:

"The property herein described being located in the State of Arkansas, this deed of trust and the notes and indebtedness hereby secured shall, without regard to the place of contract or of payment, be construed and enforced according to the laws of the State of Arkansas, and with reference to the laws of which state the parties to this agreement are now contracting."

This clause was in evident keeping with the intent of both parties. Though parties to a contract may not by their expressed intent cause their contract to be governed by the law of a state which has no substantial connection with the contract, they may select the law of a state which has such relation to the contract as Arkansas has to this one. Here Arkansas is the domicile of the borrower, the situs of the security, and the place where the preliminary negotiations for the loan were conducted. Those facts being present, the intent of the parties may

properly fix the law of Arkansas as the law governing their contract. *Lanier* v. *Union Mortgage, Banking & Trust Co.*, 64 Ark. 39, 40 S. W. 466; *McDougall* v. *Hachmeister*, 184 Ark. 28, 41 S. W. 2d 1088, 76 A. L. R. 1463. This they have done.

The Arkansas law as to the effect of usury is clear. The Arkansas Constitution, Article 19, section 13, declares that "all contracts for a greater rate of interest than ten per cent per annum shall be void, as to principal and interest, and the General Assembly shall prohibit the same by law." This was implemented by Act 39 of 1887 (Ark. Stats., 1947, section 68-609) avoiding mortgages, deeds of trust and other liens purporting to secure usurious loans.

Finally, assuming invalidity of the usurious obligation sued on, it is suggested that perhaps the plaintiff can be subrogated to the Curlin debt and lien which were discharged from funds provided by plaintiff's usurious loan. The facts are that plaintiff took no assignment of the Curlin lien, nor did he want one. He took his own deed of trust from Will and Isabella Jones, an instrument patterned to his own plans. That was the security he relied upon. The same contention was presented in *Trible* v. *Nichols*, 53 Ark. 271, 13 S. W. 796, 22 Am. St. Rep. 190, where the plaintiff made a usurious loan to the defendant, paying part of the proceeds to a prior mortgagee of defendant's land to discharge a non-usurious debt secured by the prior mortgage. In that case, the usurious lender actually took a deed (construed as a transfer of the security interest) from the prior mortgagee. The holding was that the usurious lender took nothing from the attempted subrogation. Speaking for the court, COCKRILL, C.J., said: "One who seeks protection under the equitable doctrine of subrogation must come into court with clean hands. It is not applied to relieve one of the consequences of his own wrongful or illegal act. Where therefore the claim to subrogation grows out of an agreement which is void by reason of usury, it furnishes no basis for the equitable doctrine." And see *Roe* v. *Kiser*, 62 Ark. 92, 34 S. W. 534, 54 Am. St.

Rep. 288; *City National Bank* v. *Riggs*, 189 Ark. 123, 70 S. W. 2d 574. To allow subrogation under the circumstances of the present case would be to defeat a main objective of the usury laws. Probably the most fertile field for the usurer's operations is that in which necessitous debtors seek a means for discharging valid debts previously incurred. If the usurer were subrogated to the rights of such prior creditors he would have a backlog of assurance not contemplated by our constitutional and statutory inhibitions against usury.

The decree of the Chancery Court is reversed and, the cause having been fully developed, plaintiff's action is dismissed and the Chancery Court is directed to give the defendant the relief to which he is entitled under the cross-complaint.